**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| PAMELA RANEY, | ) | CASE NO. 5:20-cv-1488 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff,  Pamela L. Raney, ("Plaintiff" or "Raney"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's  final  decision  be  VACATED  AND  REMANDED  FOR  FURTHER

CONSIDERATION CONSISTENT WITH THIS OPINION.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

On March 20, 2017, Raney filed an application for POD and DIB, alleging a disability onset date of March 4, 2017, and claiming she was disabled due to fibromyalgia, history of breast cancer, chronic migraine headaches, and pain throughout her body.  (Transcript ("Tr.") at 169.)  The applications were denied initially and upon reconsideration, and Raney requested a hearing before an administrative law judge ("ALJ").  (Tr. 183, 207-08.)

On February 14, 2019, an ALJ held a hearing, during which Raney, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 125-66.)  On April 17, 2019, the ALJ issued a written decision finding Raney was not disabled.  (*Id*. at 12.)  The ALJ's decision became final on May 11, 2020, when the Appeals Council declined further review.  (*Id*. at 1-6.)

On July 7, 2020, Raney filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17, 18.)  Raney asserts the following assignments of error:

> (1)  The ALJ erred by failing to give weight to Plaintiff's treating nurse practitioner, Mary Patterson.
>
> (2)  The ALJ erred by assigning Plaintiff a Residual Functional Capacity (RFC) that is not supported by substantial evidence.

(Doc. No. 15 at 1.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Raney was born in 1967 and was 49 years-old at the time of her alleged onset date, making her an "individual closely approaching advanced age" at all relevant times under social security regulations.  (Tr. 22.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has at least a high school

2

education and is able to communicate in English.  (*Id.*)   She has past relevant work as a salesman and Radiologic Tech.  (*Id*.)

**B.     Relevant Medical Evidence**[2]

**1.        Mental Impairments**

On May 4, 2017, Patricia Embrescia, MSSA, LISW-S, LICDC-CS, completed a clinical summary of her treatment of Raney.  (*Id*. at 799.)  She had treated Raney at four appointments, beginning in October 26, 2016, teaching coping skills to accept her physical limitations, relax, and relieve body pain and emotional stress.  (*Id*.)  She opined that the "emotional and physical stress" of Raney's work duties "contribute to chronic depression and anxiety for her, daily."  (*Id*. at 799-800.)

On June 17, 2017, consultative examining psychologist Gary Sipps, Ph.D., evaluated Raney and noted subdued affect, overt signs of anxiety, normal speech and mental content, average intelligence, and good insight and judgment.  (*Id*. at 804-6.)  Dr. Sipps opined Raney had recurrent major depression with concurrent anxiety as well as "psychological and behavioral factors related to physical conditions," but had no mental functional limitations.  (*Id*. at 806-7.)

On May 8, 2018, Bina Mehta, M.D., noted Raney was positive for depression and suicidal ideas. (*Id*. at 1005.)

On May 16, 2018, Chiropractor David Leone noted Raney was positive for suicidal ideas. (*Id*. at 1013.)

On May 21, 2018, Chiropractor Leone noted Raney was negative for suicidal ideas.  (Tr.

---

[2]        The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

1019.)

On June 1, 2018, Chiropractor Leone noted Raney was positive for suicidal ideas.  (*Id*. at 1026.)

On July 17, 2018, Karen Hodaklevic, APRN, CPN, noted Raney was "positive for depression and suicidal ideas."  (*Id*. at 1032.)

On July 30, 2018, Dr. Mehta noted Raney was "positive for depression.  This patient is nervous/anxious."  (*Id*. at 1042.)  She described Raney's memory, mood and judgment as "normal." (*Id*. at 1045.)

On August 14, 2018, Raney had an intake appointment at the Cleveland Clinic Chronic Pain Rehabilitation Program ("CPRP").  A Depression Questionnaire indicated Raney suffered from severe depression.  (*Id*. at 1139.)  On exam, she had poor eye contact, depressed affect, normal speech, logical and relevant thoughts, good judgment and insight, good memory, and normal attention and concentration.  (*Id*. at 1131.)

On August 15, 2018, Dr. Mehta noted Raney was positive for depression and suicidal ideas. (*Id*. at 1055.)

On November 5, 2018, Nurse Practitioner Patterson completed a follow up assessment for Raney's CPRP treatment. (*Id*. at 1361.) She noted Raney described her mood as "good," and had kept in touch with many of her peers from the CPRP program.  (*Id*. at 1362.)  She continued to struggle with memory, and time management, and her PHQ9 score of 18 was suggestive of severe depression. (*Id*.)

On February 19, 2019, Jillyn Collier, LPC, completed a Mental Health Residual Functional Capacity form regarding Raney.  (*Id*. at 1380.)  On February 27, 2019, this form was also signed by

4

Nurse Patterson. (*Id*. at 1384.) Counselor Collier and Nurse Patterson opined that Raney had severe impairment in interacting with others, weekly issues with responding appropriately to work criticism and would require weekly extra reminders to complete tasks. (*Id*.) They further opined that Raney met SSA Listings 12.04, 12.06 and 12.15. (*Id*. at 1381-1383.) They also opined that Raney would miss work more than 3 times per month and be off task more than 15% of the time at work. (*Id*. at 1384.)

From February 2019 through April 2019, Raney received counseling for treatment of PTSD, chronic pain, anxiety, and depression. Therapists at Coleman Professional Services noted that Raney suffered from depression, anxiety, PTSD, sleep problems, fibromyalgia and flash backs that all lead to impaired functioning with activities of daily living. (*Id*. at 62, 67, 73, 80, 111, 115-116.)

## 2. Physical Impairments

On August 1, 2016, Oncologist J. Dietz, MD, examined Raney upon her transfer of care from Louisiana. (*Id*. at 484.) Raney reported that she had bilateral mastectomies in January, and remained in constant pain from fibromyalgia. (*Id*.) She reported treating her pain with percocet and a butrane patch, and based on an ECOG Performance Status, she was restricted from physically strenuous work. (*Id*. at 484-85.) She also reported a history of childhood sexual abuse. (*Id*. at 485.) Dr. Dietz noted normal exam results, including appropriate mood and behavior, and normal gait. (*Id*. at 485.) Dr. Dietz assessed her with BRCA 1 positive, status post mastectomies and emotional issues with chronic pain. (*Id*. at 486.)

On August 24, 2016, Raney sought care from Jeffrey R. Peiffer, D.O.., for bilateral plantar fasciitis. (*Id*. at 408.) On exam, Dr. Peiffer noted tenderness of patellar facets/patellofemoral pain syndrome in her bilateral knees, pain with squats and patellar compression, normal sensation,

reflexes and pulse. (*Id*. at 410.) Dr. Peiffer assessed Raney with primary osteoarthritis of both knees, recommend reaction braces and work on activity modification and physical therapy for leg strengthening. (*Id*.)

On August 25, 2016, x-rays of Raney's knees showed good preservation of the medial and lateral compartments of both knees, along with loss of space and lateral tilting of the patella in both knees. (*Id*. at 419.)

On October 26, 2016, Kimberly Itayem and Dr. Salim Hayek examined Raney, noting that she suffered from generalized body pain, headache and depression.  (*Id*. at 423.)  On examination, she was positive for 18/18 tender points, decreased apertures on exam in both feet to mid shin, and and abnormal sensation. (*Id*. at 425-6.) She had normal range of motion, normal motor strength and reflexes, and no gross atrophy.  (*Id*.)  They opined she had drug-induced peripheral neuropathy and fibromyalgia, scheduled her for a ketamine infusion, and indicated that she may be a candidate for a spinal cord simulator. (*Id*. at 426.)

On January 17, 2017, Raney sought treatment at the University Hospital Emergency Department ("ED") with a migraine that had lasted for three days and a fibromyalgia flare in her shoulders and arms. (*Id*. at 496-7.) The ED providers assessed her with a migraine and sinusitis. (*Id*. at 498.)

On January 20, 2017, a bone scan displayed persistent increased osteoblastic activity involving the right lateral aspect of Raney's upper cervical spine, unchanged from prior study, likely representing degenerative changes. (*Id*. at 501.)

On March 8, 2017, Joshua Goldner, M.D., treated Raney's pain with facet radiofrequency ablation ("RFA").  (*Id*. at 763.)  Dr. Golden noted she suffered from severe bilateral neck pain,

6

blurred and double vision, dysuria, tingling, headaches, and depression. (*Id*. at 763.)  On exam, Raney had exhibited decreased range of motion and tenderness in her cervical and/or lumbar back, no weakness, and normal gait. (*Id*. at 765-766.)

On March 24, 2017, Raney returned for a follow up appointment and reported that the RFA had helped with her right side pain, but not the left.  (*Id*. at 779.)  She had no headaches, no dysuria, no tingling, and no weakness, but reported back pain and depression.  (*Id*.)  On exam, her back exhibited decreased range of motion, tenderness, pain, and spasm.  (*Id*. at 781.)

On April 6, 2017, Raney completed a Functional Report for social security, stating she mainly stayed in bed or was on the couch throughout the day, experienced issues with sleeping due to her pain and received assistance with many chores. (*Id*. at 321-27.)

On June 12 and 26, 2017, Raney received right prone medial branch nerve radiofrequency denervation and her providers continued to assess her with chronic neck pain, specifically spondylosis without myelopathy or radiculopathy in her cervical region. (*Id*. at 837-41, 847-51.) Treatment notes indicate Raney was diagnosed with spondylosis without myelopathy or radiculopathy in her cervical region.  (*Id*.)

On August 22, 2017, Raney presented with chronic back and neck pain, dizziness, tingling, depression and Nurse Practitioner Leone noted she was nervous/anxious. (*Id*. at 859-60.)  She reported no headache, dysuria or weakness, and said the cervical RFA provided "about 50% improvement." (*Id*. at 859.) On exam, Raney exhibited decreased range of motion, tenderness, pain and spasm in her cervical and lumbar back, no weakness, normal reflexes and normal gait. (*Id*. at 862.)

On September 5, 2017, Dr. Mehta noted Raney reported nausea, dizziness, weakness,

7

headaches, neck pain, occasional blurred vision, depression and presented as nervous or anxious. (*Id*. at 870.)  He noted "her pain is terrible today," and gave her a Toradol injection.  (*Id*. at 874.)

On September 18, 2017, Raney returned to Dr. Mehta, and reported "her pain increasing badly and she has terrible diffuse pain," and also increased anxiety and insomnia.  (*Id*. at 880.)  On examination, Dr. Mehta noted she exhibited decreased range of motion, tenderness, pain and spasms in her cervical and lumbar back, normal gait, and no weakness.  (*Id*. at 882.)  He administered a joint injection and referred her to the CPRP.  (*Id*. at 883.)

On October 18, 2017, Dr. Mehta noted Raney reported dysuria, depression, and presented as nervous or anxious. (*Id*. at  902.)  He administered a joint injection.  (*Id*. at 906.)

On November 7, 2017, Dr. Mehta noted Raney reported constipation, headaches, dysuria, depression, and presented as nervous or anxious.  (*Id*. at 912.)  He administered a Botox injection for treatment of her migraine headache.  (*Id*. at 914.)

On November 20, 2017, Dr. Mehta noted Raney was "doing ok overall but is very tired with little energy today."  (*Id*. at 920.)  She reported the joint injections and Botox injection were effective, but her left neck pain "just will not go away." (*Id*.)  On examination, Dr. Mehta noted she exhibited decreased range of motion, tenderness, pain and spasms in her cervical and lumbar back, normal gait, and no weakness.  (*Id*. at 922.)  He administered 3 trigger point injections.  (*Id*. at 925.)

On January 1, 2018, Dr. Mehta noted Raney was "still having some numbness and tingling at times in the 5th fingers bilaterally," and "a lot more pain in the left neck."  (*Id*. at 932.)  She had recently used her TENS unit and heat to successfully treat her right neck when it locked up.  (*Id*.)  On examination, Dr. Mehta noted she exhibited decreased range of motion, tenderness, pain and spasms in her cervical and lumbar back, normal gait, and no weakness.  (*Id*. at 934.)  He ordered a

cervical RFA, which she reported had previously been very helpful.  (*Id*. at 935.)

On March 28, 2018, Raney saw Karen Hodakievic, APRN, CNP, who noted her pain severity was 4/10, and associated symptoms included headaches and tingling.  (*Id*. at 945.)  Nurse Hodakievic noted cervical RFAs had been administered on Febraury 18, 2016 and March 14, 2018, which "helped the pain here by over 80% so far," and Raney also reported trigger point injections were "very helpful."  (*Id*.)  She reported her headaches were "less intense" and frequency had decreased by half.  (*Id.*)  On examination, Raney exhibited decreased range of motion, swelling and tenderness in her right and left knees, decreased range of motion, tenderness, pain and spasm  in her cervical back, normal reflexes, and normal gait. (*Id*. at 947.)

On April 10, 2018, Nurse Hodakievic noted Raney reported pain severity of 8/10 on her right side and right knee, with headaches and tingling, but no weakness. (*Id*. at 956.)  On examination, Raney exhibited decreased range of motion, swelling and tenderness in her right and left knees, decreased range of motion, tenderness, pain and spasm  in her cervical back, normal reflexes, and normal gait. (*Id*. at 959.)  Nurse Hodakievic recommended trigger point injections.  (*Id*.)

On April 13, 2018, Dr. Mehta administered 5 trigger point injections.  (*Id*. at 971.)

On April 16, 2018, Raney received an ultrasound guided injection in her left knee.  (*Id*. at 981.)  Following the procedure, she reported a pain intensity of 2.  (*Id*.)

On April 30, 2018, Raney received an ultrasound guided injection in her left knee.  (*Id*. at 991.)  Following the procedure, she reported a pain intensity of 2.  (*Id*.)

On May 1, 2018, Chiropractor Leone noted Raney had moderate hypertonicity through her cervical, thoracic, and lumbar paraspinal muscles, improved range of motion, pain on flexion and extension, and reduced motor strength.  (*Id*. at 998.)  He provided manipulation therapy.  (*Id*.)

9

On May 8, 2018, Dr. Mehta noted Raney reported constipation, nausea, tingling, weakness, headaches, dysuria, and depression.  (*Id*. at 1005.)  He administered a Botox injection for Raney's migraine headache.  (*Id*. at 1008.)

On May 16 and May 21, 2018, Raney returned for chiropractic care and Chiropractor Leone noted Raney had moderate hypertonicity through her cervical, thoracic, and lumbar paraspinal muscles, improved range of motion, pain on flexion and extension, and reduced motor strength.  (*Id*. at 1013, 1019.)  He provided manipulation therapy.  (*Id*.)

On July 17, 2018, Nurse Hodakievic noted Raney reported pain severity of 7/10 on her left and right side and right knee, with headaches and tingling, but no weakness. (*Id*. at 1032.)  On examination, Raney exhibited decreased range of motion, swelling and tenderness in her right and left knees, decreased range of motion, tenderness, pain and spasm  in her cervical back, normal reflexes, and normal gait. (*Id*. at 1035.)

On July 30, 2018, Dr. Mehta noted Raney reported "having increased pain and fatigue," and "did not leave her house for 4 days last week due to the pain."  (*Id*. at 1042.)  Raney also reported constipation, nausea, vomiting, dizziness, tingling, weakness, headaches, dysuria, and depression. (*Id*.)  On examination, Raney exhibited decreased range of motion, swelling and tenderness in her right and left knees; decreased range of motion, tenderness, bony tenderness and pain in her cervical and thoracic back; normal reflexes; and normal gait. (*Id*. at 1045.)

On August 14, 2018, Raney had an intake appointment with Mary Patterson, APRN, CNP, at the Cleveland Clinic CPRP.  She  scored 130 on a Pain Disability Questionnaire administered at CPRP, indicating an extreme disability.  (*Id*. at 1139.)  She reported a current pain level of 6/10, and had stopped opioid medication about two weeks prior, and was currently craving them.  (*Id*. at 1127-

9.)  She had been using medical marijuana since October 2017, but stopped in preparation for beginning the CPRP.  (*Id*.)

On August 15, 2018, Dr. Mehta noted Raney reported headaches, dysuria, constipation, nausea and vomiting, but no dizziness, tingling, or weakness.  (*Id*. at 1055.)  He administered a Botox injection to treat her migraine headache.  (*Id*. at 1058.)

On August 16, 2018, Raney had a physical therapy examination. She showed weakness, tingling, and pain in her right and left upper extremities and examination revealed palpation tenderness in her right and left cervical and thoracic spine, with minimal to major limitations in her cervical spine movements and pain during her thoracic movements. (*Id*. at 1169-70.)  Her gait was mildly altered, with slow cadence, and she used a cane with minimal weight bearing.  (*Id*. at 1170.)

On August 18, 2018, CPRP practitioners completed a functional assessment of Raney. Raney had 3+/5 proximal strength[3] and exhibited weakness, tingling and pain in both upper extremities. (*Id*. at 1160- 61.)  Upper extremity range of motion and grip strength were within functional limits.  (*Id.* at 1161.)  She was tearful, fidgeting, and unable to sit still.  (*Id*. at 1160.)

On September 5, 2018, a CPRP Physical Therapist noted Raney was "independent with mobility without an assistive device," and was able to perform 20 repetitions of a leg press with 50 pounds, squats, lunges, heel/toe raises, standing and prone knee flexion, and other exercises. (*Id*. at 1274-5.)

On September 7, 2018, a CPRP Occupational Therapist noted Raney "demonstrated slow, steady improvement with posture, body mechanics and independence with daily functional tasks." (*Id*. at 1287.)  On the same date, a CPRP Physical Therapist noted Raney reported improved

---

[3]      Notes state this is "within functional limits."  (Tr. 1161.)

tolerance for activity in general.  (*Id*. at 1291.)

On September 10, 2018, Raney was experiencing a migraine headache, and reported her pain "symptoms were brought on by physical effort but made worse by talking about emotional issues from weekend."  (*Id*. at 1297.)  She was only able to do 15 repetitions of a leg press with 62.5 pounds, and 15 repetitions of bicep curls with no weight.  (*Id*. at 1302.)

On September 12, 2018, Raney demonstrated "considerable functional improvement," and informed the CPRP staff that she was "considering making today her last day" in the program, because she was "anxious to move on to what is next.  Wants to get back to fishing and biking."  (*Id*. at  1327.)  Her timed "up and go" was 8.89 seconds, and she climbed 55 steps in her 1 minute stair climb.  (*Id*.)

On September 14, 2018, Raney's CPRP physical therapy discharge summary noted significant improvement over the course of the program, including a decline in her pain behavior scale from 7.5/10 on admission to 4/10 on discharge.  (*Id*. at 1347.)  She was able to tolerate 25 minutes of aerobic activity.  (*Id*. at 1348.)

On October 29, 2018, Nurse Hodakievic noted Raney reported pain severity of 4/10 on her left and right side, with constipation, nausea, and diarrhea. (*Id*. at 1081.)  Raney reported receiving cervical RFA on September 24 and October 1, 2018, and this had helped her pain in that area "by over 90%."  (*Id*.)  She reported counseling, CPRP and her TENS unit were also "helping her greatly," and she was "overall satisfied with her pain management."  (*Id*.)  On examination, Raney exhibited decreased range of motion, swelling and tenderness in her right and left knees, decreased range of motion, tenderness, pain and spasm  in her cervical back, normal reflexes, and normal gait. (*Id*. at 1084.)

On November 5, 2018, Nurse Patterson completed a follow up assessment for her CPRP treatment. (*Id*. at 1361.) She noted Raney described her pain as "in much better control," was continuing to stretch "with benefit," and using Tylenol to control her pain.  (*Id*. at 1362.)  She reported her pain level as 5/10, and reported having more energy and interest in doing more around the home.  (*Id*.)  Her Pain Disability Index score of 54/70 suggested severe functional impairment.

On November 7, 2018, Raney received an ultrasound guided injection in her right knee.  (*Id*. at 1093.)  Following the procedure, she reported a pain intensity of 3.  (*Id*.)

On November 21, 2018, Raney received an ultrasound guided injection in her left knee.  (*Id*. at 1103.)  Following the procedure, she reported a pain intensity of 6.  (*Id*.)

On November 26, 2018, Raney returned for chiropractic care and reported feeling "so much better" after her last visit, with a current pain level of 4/10.  (*Id*. at 1110.) Chiropractor Leone noted Raney had leg swelling, and reported tingling, weakness and headaches.  (*Id*.)  He provided manipulation therapy.  (*Id*.)

On February 27, 2019, Miljan Cecez, PT, DPT, CFCE performed a Functional Capacity Evaluation of Raney.[4]  He opined Raney put forth full effort and demonstrated the ability to perform within the Sedentary physical demand category. (*Id*. at 1386.) He also opined that she is unable to work full time because she can only work for up to 5 hours and 16 minutes per day "while taking into account her need to alternate sitting and standing,"and her ability to perform unskilled sedentary occupational work is "significantly eroded because she is unable to sit for 5 hours and 17 minutes, and sit at least 2 hours at one time." (*Id*. at 1386.)  Mr. Cecez concluded on the FCE that Raney

---

[4]     On March 22, 2019, Nurse Patterson wrote that she had reviewed Mr. Cecez's Functional Capacity Evaluation and "agree[d] with the results of that thorough complete evaluation as documented." (Tr. 1388.)

demonstrated only an occasional tolerance for "Bending, Forward Reaching, Fine Coordination, Pinching, Simple Grasping, Squatting, Stair Climbing and Walking." (*Id.*)

**C.**     **State Agency Reports**

**1.**     **Mental Impairments**

On June 30, 2017, state agency reviewing psychologist Katherine Reid reviewed the record and opined that Raney had depressive disorder, somatic symptoms, and related disorders which caused moderate impairment in her ability to concentrate, persist or maintain pace. (*Id*. at 175.)  She opined Raney was moderately limited in her ability to maintain attention and concentration for extended periods and complete a normal workday or workweek without interruption from psychologically-based symptoms, but that she was able to attend and persist in order to complete simple and multi-step tasks in a setting that does not require strict pace or production demands.  (*Id*. at 179.)

On August 29, 2017, state agency reviewing psychologist Carl Tishler reviewed the record and affirmed Dr. Reid's opinion.  (*Id*. at 193-4.)

**2.**     **Physical Impairments**

On July 6, 2017, state agency reviewing physician Gerald Klyop reviewied the record and opined that Raney had the following physical functional limitations:

- Occasionally lift or carry 20 pounds;

- Frequently lift or carry 10 pounds;

- Stand or walk 6 hours in an 8-hour workday with normal breaks;

- Sit about 6 hours in an 8-hour workday with normal breaks;

- Limited pushing or pulling in her lower extremities;

14

- Occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl;

- Never climb ladders, ropes or scaffolds; and

- Avoid even moderate exposure to noise and hazards.

(*Id*. at 177-8.)

On September 13, 2017, state agency reviewing physicians Stephen McKee reviewed the record and affirmed Dr. Klyop's opinion.  (*Id*. at 191-3.)

**D.      Hearing Testimony**

During the February 14, 2019 hearing, Raney testified to the following:

- She is 5 feet four inches tall, and ambidexterous.  (*Id*. at 131-2.)

- She lives with her mother, who takes care of her and supports her financially.  (*Id*. at 132.)

- She has a driver's license and drives occasionally.  (*Id*.)

- She worked in Louisiana as an x-ray technician.  She worked in a surgery center, and OR, and a walk-in clinic.  It was heavy work since she had to push C arms, OR equipment, and move patients, and also mentally demanding.  She was good at it. (*Id*. at 134-5.)

- More recently, she sold coins or silver bullion.  At that job, she had to stock shelves. (*Id*. at 136-8.)

- She stopped working in 2017 because her body failed her and she couldn't work anymore.  She was having headaches, and couldn't use her arms because of pain from fibromyalgia and neuropathy.  (*Id*. at 139-40.)

- She developed neuropathy due to an adverse reaction to chemotherapy in 2008.  The reaction caused skin to peel off her hands and feet, and her nails fell off.  The residual neuropathy causes pain, itching, numbness and burning throughout her body.  (*Id*. at 140.)

- That experience also caused anxiety, pain, and PTSD.  She couldn't use her hands for months as her nails grew back.  (*Id*. at 141.)

- The residual neuropathy began in 2008, but she was able to keep working for a

15

while.  (*Id*.)

- Her pain is constant, but the intensity is worse when she is anxious, stressed, or physically active.  (*Id*. at 142.)

- She is regularly treated by Nurse Practitioner Mary Patterson for depression, anxiety, bipolar disorder and pain.  (*Id.*)

- Her pain is currently treated with gabapentin, medical marijuana, lidoderm patches and a TENs unit.  (*Id*. at 143.)

- She had been on opiates, but switched to medical marijuana so she could stop taking opiates.  (*Id*.)

- She had mental health counseling through the Chronic Pain Rehabilitation Program, and recently began counseling through Coleman.  (*Id*. at 144.)

- Her mental health symptoms have been worse lately.  PT flashes disturb her thoughts hourly, and distract her and prevent her from doing or thinking about other things.  (*Id*. at 145.)

- In 2017, she felt suicidal because she was stuck in a pain cycle, but the Cleveland Clinic program helped a lot.  (*Id*. at 146.)

- Her chemo has damaged her memory, and its hard for her to remember what she did yesterday.  She was very anxious about the hearing today, so she organized her paperwork, then she needed a nap, then she got her clothes out and everything she would need for today.  Choosing her clothes took half an hour because she has trouble making decisions.  Her anxiety put her stomach in a knot, but she tried to eat and drink enough.  She had a lot of intrusive thoughts.  She went through her prescriptions and went out to get them refilled.  (*Id*. at 147-9.)

- Her mother does almost all of the cooking.  She sometimes does dishes but it is difficult because of pain in her shoulders and arms.  She does a little bit of vacuuming, with rests as she works.  (*Id*. at 149.)

- She cleans the bathroom, but it is hard and she takes breaks as she works.  Her mom does the laundry.  Her mom pays someone to do the yard work.  (*Id*. at 150.)

- Sometimes she goes to the doctor by herself, but if she's not feeling good, her mom will take her.  Her mom does the grocery shopping.  All of this makes her mom tired, so she helps as much as she can.  (*Id*. at 151.)

- She made friends in the pain rehabilitation program.  Sometimes they still visit each

16

other.  (*Id*. at 152.)

- Her niece and nephew visited last summer. They are 11 and 15 years old.  They played card games and board games and watched tv together.  She went fishing with them, because they did all the physical work.  (*Id*. at 152-3.)

- She experiences migraine headaches 15 to 20 days a month.  She treats them with Botox, radio frequency and medications.  When she has a Botox treatment, they are reduced to about 10 days a month.  (*Id*. at 154.)

- The radio frequency treatments are for pain in her head, neck and shoulders.  They are supposed to last 6 months, but only help for 4 to 5 months.  (*Id*. at 155.)

- With her dishwasher broken and her mom out of town, she is eating off paper plates to minimize cleanup.  (*Id*. at 156.)

- Her medications cause side effects including nausea, nervousness, and jitters.  Some make her too tired, and other keep her from sleeping.  (*Id*. at 157.)

- She uses a cane on and off.  She used it to come to the hearing because she wasn't sure how far she would have to walk.  She has used a cane for three years.  E Management told her to use it.  (*Id*. at 158.)

- Her mother was going to be gone for two weeks, and while her mom is away, she cares for their two cats by cleaning the litter box, but she cannot change the litter.  (*Id*. at 159.)

The VE testified Raney had past work as a sales clerk and radiologic tech.  (*Id*. at 161.)  The ALJ then posed the following hypothetical question:

> Assume a hypothetical individual of the claimant's age and education with the past jobs you described.  Further assume this individual is limited to light work with the following additional limitations.  Frequent overhead reaching and reaching in other directions bilaterally, frequent handling and fingering bilaterally.  Occasional ramps and stairs, no ladders, ropes or scaffolds, occasional stoop, kneel, crouch and crawl.  No unprotected heights, moving mechanical parts, or operating a motor vehicle.  Avoiding concentrated exposure to vibration, simple, routine, and repetitive tasks but not at a production rate pace, occasional interaction with supervisors, coworkers and the public and that hypothetical individual cannot perform the past jobs.  Is that correct?

(*Id*. at 161-2.)

17

The VE testified the hypothetical individual would not be able to perform Raney's past work as sales clerk and radiologic tech.  (*Id*. at 162.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as mailroom clerk, electronic worker, or merchandising marker.  (*Id*.)

The ALJ next amended the hypothetical by adding the limitation of the use of a cane to ambulate.  *(Id*.)  The VE testified that although the DOT does not address using essential devices, in his professional judgment this limitation would eliminate all light duty work, including the jobs he identified.  (*Id*. at 162-3.)  The VE also testified that, in his professional judgment, more than 10% of time off task or 2 days of absence per month would preclude competitive employment.  (*Id*.)

After questioning by Raney's counsel the VE also testified that adding a limitation to occasional overhead reaching would not affect the jobs he identified, but adding a limitation of occasional handling and fingering of either the dominant hand or both hands would eliminate competitive employment at an unskilled job.  (*Id*. at 163-4.)  He testified that the inclusion of a sit/stand option in the first hypothetical would eliminate competitive employment if it was for more than a very short time.  (*Id*. at 164.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when he

became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Raney was insured on his/her alleged disability onset date, March 4, 2017, and remains insured through June 30, 2022, his/her date last insured ("DLI.") (Tr. 17.) Therefore, in order to be

entitled to POD and DIB, Raney must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2022.

2.  The claimant has not engaged in substantial gainful employment since March 4, 2017, the alleged onset date.

3.  The claimant has the following severe impairments: history of breast cancer, status-post double mastectomy; migraine headaches; chemotherapy-induced peripheral neuropathy; fibromyalgia; degenerative disc disease of the lumbar spine; depressive disorder; PTSD.

4.  The claimant does not have a medical impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire records, I find that the claimant has the residual functional capacity to perform light work as defined in 20CFR 404.156(b) except: frequently reaching overhead to the left, and frequently reaching overhead to the right.  For all other reaching, she can reach frequently to the left, and can reach frequently to the right. She can handle items frequently with the left hand, and can handle items frequently with the right hand.  She has fingering limitations frequently with the left hand, and has fingering limitations frequently with the right hand; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally stoop, kneel, crouch and crawl; can never work at unprotected heights, never moving mechanical parts, and never operate a motor vehicle; avoid concentrated exposure to vibration; can perform simple, routine, and repetitive tasks but not at a production rate pace; occasional interaction with co-workers, supervisors, and the public.

6.  The claimant is unable to perform any past relevant work.

7. The claimant was born *** 1967 and was 49 years old, whoch is defined as an individual closely approaching advanced age, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills os not material to the determination of disability because using the Medical-Vocational Rules as framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(Tr. 17-23.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

21

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord

*Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.        First Assignment of Error: The Opinions Endorsed by Nurse Patterson

Raney asserts that the ALJ erred by failing to weigh Nurse Patterson's opinions in his decision. (Doc. No. 15 at 9.) She notes that Nurse Patterson affixed her signature to the final page of a mental health RFC Questionnaire completed by a counselor, Jillyn Collier, and she endorsed the physical RFC evaluation performed by physical therapist Miljan Cecez by letter. (*Id.* at 9-10.) She asserts that this omission is significant because Nurse Patterson is the only treating provider that contributed an opinion regarding Raney's mental and physical functional capacity. (*Id*. at 12.)

The Commissioner responds that the ALJ did weigh the opinions endorsed by Nurse Patterson, but was not required to provide a treating physician analysis and explain why he did not give the opinions controlling weigh, because under the regulation in effect at the time of Raney's filing, a nurse practitioner did not qualify as a an acceptable medical source. (Doc. No. 17 at 11-13.)

Under the Social Security Regulations in effect at the time Raney filed her claim for disability benefits, a nurse practitioner is not an "acceptable medical source" entitled to the type of "controlling weight" an "acceptable medical source" enjoys. *See* 20 C.F.R §§ 416.902(a)(1) - (8),

23

416.927(a)(1), 416.927(f).[5]  However, the regulations also provide these opinions still must be considered, using the same factors listed in 20 C.F.R. § 416.927(c).  The regulations further provide "not every factor for weighing opinion evidence will apply in every case" and the "adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."  20 C.F.R. § 416.927(f)(1)-(2).

Social Security Ruling 06-03[6] further explains how opinion evidence from "other sources" should be treated.  SSR 06-03p explains information from "other sources," such as a nurse practitioner or therapist, is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939 at *2-3 (August 9, 2006).  Interpreting this SSR, the Sixth Circuit has found opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion."  *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007) ("Following SSR 06-03p, the ALJ should have discussed the factors relating to his treatment of Hasselle's assessment, so as to have provided some basis for why he was rejecting the opinion").  *See also Williams v. Colvin,* No. 5:15-cv-2185, 2017

---

[5]     For claims filed prior to March 27, 2017.  *See* 20 C.F.R. § 416.902(a)(7). Raney's claim was filed on March 20, 2017.  (Tr. 169.)  In the revised regulations, applicable to claims filed on or after March 27, 2017, nurse practitioners were elevated to an acceptable medical source. *See* 20 C.F.R. § 404.1502(a)(7).

[6]     The Court notes SSR 06-03p was rescinded on March 27, 2017.  This rescission is effective for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298 at *1.  Raney's claim was filed on March 20, 2017.  (Tr. 169.)

WL 1074389 at *3 (N.D. Ohio March 22, 2017).

As noted *supra*, Nurse Patterson endorsed two opinions in this case.  Each will be discussed individually below.

### i.    The Joint Opinion of Counselor Collier and Nurse Patterson

On February 19, 2019, Counselor Collier completed a Mental Health Residual Functional Capacity form regarding Raney.  (Tr. 1380.)  On February 27, 2019, this form was also signed by Nurse Patterson.  (*Id*. at 1384.)  Counselor Collier and Nurse Patterson opined Raney met the criteria for PTSD and trauma/stressor related disorder; exhibited symptoms of depression and bipolar disorder; and had severe impairments in interacting with others, weekly issues with responding appropriately to work criticism and would require weekly extra reminders to complete tasks.  (*Id.* at 1380, 1383.)  They further opined that Raney met SSA Listings 12.04, 12.06 and 12.15. (*Id*. at 1381-1383.)  They opined that Raney would miss work more than 3 times per month and be off task more than 15% of the time at work. (*Id*. at 1384.)

The ALJ addressed this joint opinion as follows:

> I afford little weight to the opinion at Exhibit 15F/6-7, as it relies entirely on the claimant's subjective complaints of mental health symptoms and is not based on any objective evaluation or longitudinal observation of the claimant's mental health.

(*Id*. at 22.)

At the outset, the Court notes that the opinion is 5 pages long, not 2, and is found at Exhibit 15F/3-7.  (*Id*. at 1380-84.)  Further, ALJ's brief explanation that the opinion"is not based on any objective evaluation or longitudinal observation of the claimant's mental health brief explanation" does not acknowledge that Nurse Patterson had a documented treatment relationship with Raney that began in August 14, 2018, when Raney was admitted to the CPRP program.  (*Id*. at 1133.)  On

November 5, 2018, Nurse Patterson completed a follow-up assessment at the end of her CPRP treatment, which included a review of her treatment records throughout the CPRP, which included a significant amount of mental health counseling as well as physical and occupational therapy. (*Id*. at 1361.)  Objective evaluations of mental health symptoms in Nurse Patterson's notes include a Global Mental Health T score of 21.2 on her admission to the program,[7] and a Depression Questionnaire indicating Raney suffered from severe depression.  (*Id*. at 1139.)  At her intake exam, she had poor eye contact, depressed affect, normal speech, logical and relevant thoughts, good judgment and insight, good memory, and normal attention and concentration.  (*Id*. at 1131.)  Two days later, On August 16, 2018, Nurse Patterson noted Raney reported loss of energy, appetite and sleep, and passive thought of suicide.  (*Id*. at 1145.)  On exam, she observed Raney had poor eye contact, a depressed affect that varied from jocular to tearful, normal speech, logical and relevant thoughts, normal attention span, concentration and good judgment and insight.  (*Id*. at 1148.)  Raney was discharged from the CPRP on September 14, 2018.  (*Id*. at 1361.)  On November 5, 2018, Nurse Patterson noted Raney continues to have a Depression Questionnaire score indicating she suffered from moderately severe depression, but described her mood as "good," although she reported problems with forgetfulness and time management. (*Id*. at 1362, 1370.)  All of this belies the Commissioner's assertion that Nurse Patterson's treatment of Raney was limited to pain management.  (Doc. No. 17 at 12.)

The ALJ's conclusion that the joint opinion is based only on subjective reporting is, however, consistent with the opinion itself, which twice explains that the opined limitations are

---

[7]        This score indicated that Raney's mental health is better than 0.20% of the general population.  (Tr. 1139.)

based on symptoms endorsed by the patient.  (*Id*. at 1380, 1383.)  This, as well as the dates of the signatures, suggests that the opinion was authored by Counselor Collier, and co-signed by Nurse Patterson.  Courts in this District have made clear that if "treating physician expressly adopts the findings of a non-acceptable medical source, such as a physical therapist, the non-acceptable source opinion becomes that of the treating physician." *See Burlingame v. Comm'r of Soc. Sec*., No. 5:18 CV 417, 2018 WL 7252942 at *8 (N.D. Ohio Dec. 20, 2018), *report and recommendation adopted*, 2019 WL 480706 (N.D. Ohio Feb. 7, 2019).  Raney asks this Court to extend that rationale to "other source" opinions.  (Doc. No. 15 at 10.)  However, that does not mean that the opinion was based on treatment records or observations of the co-signatory, when the opinion specifies otherwise.  It is reasonable to conclude that the ALJ based his conclusion that the opinion was based "entirely on the claimant's subjective complaints of mental health symptoms," because he found credible the authors' statements that     the clinical basis for their conclusions were the symptoms Raney endorsed.  Although a more detailed explanation of his reasoning would have been helpful, it would be perverse for this Court  to require remand to reweigh an opinion where the ALJ's explanation is consistent with the plain language of the opinion itself.  Therefore, this assignment of error is without merit.

> **ii.** **The Opinion of Physical Therapist Cecez Endorsed by Nurse Patterson**

On February 27, 2019, Physical Therapist Cecez performed a Functional Capacity Evaluation of Raney.   On March 22, 2019, Nurse Patterson wrote I have reviewed the Cleveland Clinic Rehabilitation and Sports Therapy Functional Capacity Evaluation and agree with the results of that thorough complete evaluation as documented." (*Id*. at 1388.)  Mr. Cecez opined Raney put forth full effort and demonstrated the ability to perform within the sedentary physical demand category. (*Id*. at 1386.)  She was able to lift 10 pounds to below waist height, lift 5 pounds to

shoulder height, and carry 12 pounds.  (*Id*.)  She pushed and pulled 15 horizontal force pounds.  (*Id*.)

He also opined that Raney was unable to work full time because her ability to perform unskilled

sedentary occupational work is "significantly eroded because she is unable to sit for 5 hours and 17

minutes, and sit at least 2 hours at one time." (*Id*.)  Mr. Cecez concluded that Raney demonstrated

only an occasional tolerance for "Bending, Forward Reaching, Fine Coordination, Pinching, Simple

Grasping, Squatting, Stair Climbing and Walking." (*Id*.)

> The ALJ addressed Mr. Cecez's opinion as follows:
>
> On February 27, 2019, the claimant attended an independent functional capacity evaluation.  The therapist concluded that the claimant could perform sedentary exertional work with occasional bending, forward reaching, fine coordination, pinching, simple grasping, squatting, stair climbing, and walking.  She should avoid shoulder reaching, balancing, firm grasping, and gross coordination.  She must alternate between sitting and standing.  However, she cannot sit for the full time that she can work, up to 5 hours and 16 minutes; therefore, she cannot work any job.  I afford little weight to the evaluator's opinion, as it is not consistent with the overall record.  Likewise, it does not show an objective evaluation of the claimant's ability to perform work-related activity.  In fact, it is a physical performance test, which relies on the claimant's physical response to a series of task, not a medical evaluation.  Nevertheless, the evaluator's conclusion that the claimant cannot work because she cannot sit for up to 5 hours and 16 minutes is subordinate to an opinion that measures her range of motion, motor strength, gait pattern, body tone, etc.  It is a test of strength, not ability; there is no objective clinical evidence to evaluate how the therapist reached his conclusion regarding the claimant's ability to sit, stand or walk, or perform sedentary work.  Further, there are no notes from this evaluation, to evaluate the consistency of the opinion with the findings made at the time of the evaluation.

(*Id*. at 21-22) (internal citation omitted).

Again, the ALJ failed to note that Nurse Patterson endorsed this opinion via letter, although

he throughly explained his reasoning for the weight he assigned to this opinion.[8]   However, his

---

[8]     The Commissioner asserts that Nurse Patterson did not, in fact, endorse the opinion authored by Mr. Cecez.  (Doc. No. 17 at 14.)  This is an error.  Mr. Cecez's opinion is entitled "Cleveland Clinic Rehabilitation and Sports Therapy

concern that the clinical basis for the opinion was not throughly documented in well-founded.  The record shows that the "Physical Performance Test" and documentation lasted 105 minutes, but the record does not show the results of this test, except for strength testing.  Mr. Cecez's opinion that Raney was able to lift 10 pounds to below waist height, lift 5 pounds to shoulder height, and carry 12 pounds is partially in conflict with the ALJ's conclusion that she could perform light work, which requires lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  *See* CFR § 404.1567(b).  However, although the ALJ explained the results of the physical stress test were "subordinate to an opinion that measures her range of motion, motor strength, gait pattern, body tone, etc,"  the ALJ did not identify such an opinion nor did he identify other evidence in the medical record that supported these less-stringent lifting limitations.  Further, the limitations appear consistent with the Physical Therapy Discharge Summary completed by members of the CPRP physical therapy team on September 12, 2018, which noted Raney could tolerate 10 repetitions of bicep curls with a 3 pound weight, far short of her goal of performing 15 repetitions with an 8 pound weight.  (*Id*. at 1347-48.)  The ALJ's opinion is consistent with the opinions of the state agency reviewers, but these doctors cited only diagnoses, not actual records, as the basis for their opined limitations.[9]  (*Id*. at 178, 191.)

The ALJ has discretion to assign any weight to the opinion of a non-acceptable medical

---

Functional Capacity Evaluation," and is therefore the opinion that Nurse Patterson explicitly endorsed in her letter.  (Tr. 1385, 1388.)  The second evaluation, entitled "Residual Functional Capacity Form - Physical," which Nurse Patterson declined to endorse, was not included as a submission with her letter, and cannot be identified by the Court.

[9]  Both doctor's explain their exertional limitations are based on "Bilate LE peripheral neuropathy; very mild DDD of L&C spine, fibromyalgia, knee pain." (Tr. 178, 191.)

source, however, "the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning." *Stacey v. Commissioner of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011.) Here, the ALJ's assertion that the Opinion of Mr. Cecez, endorsed by Nurse Patterson, is subordinate to other medical records which are identified nowhere in his opinion, does not meet that low bar. Further, Mr. Cecez's opinion is consistent with the medical records from the CPRP, where Nurse Patterson treated Raney, and the ALJ did not identify any records that were not consistent with the opinion. Because of Raney's age, a limitation to sedentary employment would be a critical factor in the determination of disability, and therefore a meaningful judicial review of the decision requires the ALJ to clearly explain his treatment of the relevant evidence.

For all the foregoing reasons, the undersigned recommends that this decision be remanded to allow the ALJ to more fully explain his treatment of the  Cleveland Clinic Rehabilitation and Sports Therapy Functional Capacity Evaluation conducted by Mr. Cecez and endorsed by Nurse Patterson.

**B.      Second Assignment of Error: The Opinion is Not Supported by Substantial Evidence**

Raney also asserts that the ALJ erred by failing to support his RFC determination with substantial evidence, as required by law. (Doc. No. 15 at 14.) She argues the ALJ failed to consider the record as a whole, cherry-picked facts without providing the entire exhibit or cite, and improperly questioned Raney's communications with her providers.  (*Id.*).

The Commissioner responds that the ALJ reasonably assessed Raney's RFC, fully accounted for her physical and mental limitations, and supported his determination with substantial elements. (Doc. No. 17 at 5-6.) He asserts that the ALJ did not cherry-pick evidence and considered Raney's activities of daily living as documented throughout the record, and was not required to

specifically cite them each time they were referenced.  (*Id*. at 8-9.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[10]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96  8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96  8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v.*

---

[10]    This regulation has been superseded for claims filed on or after March 27, 2017.  As Raney's application was filed March 20, 2017, this Court applies the rules and regulations in effect at that time.

*Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016), citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin,* No. 3:16CV765*,* 2017 WL 784563 at *14 (N.D. Ohio Feb. 28, 2017) (accord). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec*., 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany Johnson v. Comm'r of Soc. Sec*., 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474 at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec*., No. 1:11 CV 2313, 2013 WL 943874 at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding'"); *Johnson v. Comm'r of Soc. Sec*., No. 2:16-cv-172, 2016 WL 7208783 at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes").

As noted *supra*, the ALJ's RFC determination regarding Raney's physical functional capacity to lift and carry was unsupported by any record evidence besides the opinions of the state

agency reviewing physicians, who did not identify the evidence on which they relied.  Further, the

only activities of daily living enumerated by the ALJ were presented in the context of analyzing her

mental functional capacity.  The ALJ noted:

- The claimant . . . stated that she could preform simple maintenance, prepare meals, pay bills, go to doctor's appointment, and drive.  (*Id*. at 18.)

- The claimant said that she is also able to rive, pay bills. Prepare meals, watch tv, manage funds, use the internet, and handle her own medical care.  (*Id*.)

- The claimant reported . . . she lived with her mother and helped with household chores.  She listened to radio, watched television, visited with her boyfriend, communicated with friends, and was independent in self-care and personal hygiene. (*Id*. at 21.)

As Raney noted, none of these assertions are supported by citations.  However, more significant is

the fact that none of these activities of daily living appear relevant to the ALJ's determination that

Raney was capable of light work.

The last state agency reviewing physician completed his opinion on September 13, 2017.

(*Id*. at 191-3.)  Almost a year later, on August 14, 2018, Raney's pain was deemed so severe and

disabling by her medical providers that she was enrolled in a five-week intensive rehabilitation

program.  (*Id*. at 1139.)  Given the significant amount of additional evidence added to the record

after the state agency reviewers completed their analysis, it was necessary for the ALJ to provide a

clear explanation of why he found their opinions more compelling than the records from sources who

had more recently completed physical assessments of Raney.  Absent such an analysis, this Court

cannot provide a substantive review of the ALJ's decision.  In this case,  the reasons given by the

ALJ fail to "build an accurate and logical bridge between the evidence and the result."  *Fleischer v.*

*Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011), quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th

Cir. 1996).  Therefore, the undersigned recommends that this decision be remanded to allow the ALJ

to more clearly explain his determination regarding Raney's physical functional capacity.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be vacated and remanded for further consideration consistent with this opinion.  On remand, the ALJ should more fully explain his treatment of the Cleveland Clinic Rehabilitation and Sports Therapy Functional Capacity Evaluation conducted by Mr. Cecez and endorsed by Nurse Patterson, and more clearly explain his determination regarding Raney's physical residual functional capacity.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: April 29, 2021

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**